1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   CRAIG LAMAR FOSTER,                    )   Case No.: 1:19-cv-00860-DAD-JLT (HC)
                                            )
12                 Petitioner,             )   FINDINGS AND RECOMMENDATION TO
                                            )   DENY PETITION FOR WRIT OF HABEAS
13        v.                                )   CORPUS
                                            )
14   JOSIE GASTELO, Warden,                 )   [TWENTY-ONE DAY OBJECTION DEADLINE]
                                            )
15                 Respondent.             )
                                            )
16   _____ )

17        Petitioner is currently in state prison serving a sentence of 74 years to life for his conviction for

18   offenses surrounding shooting two people in a bar. He filed the instant habeas petition challenging the

19   conviction. As discussed below, the Court finds the claims to be without merit and recommends the

20   petition be **DENIED**.

21   **I.        PROCEDURAL HISTORY**

22        Petitioner was convicted of second-degree murder of Janee Tatum (Pen. Code, § 187) and

23   attempted murder of Herman Tatum, Jr. (§§ 664/187), with enhancements for personally and

24   intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). People

25   v. Foster, 2019 Cal. App. Unpub. LEXIS 92, at *1 (Cal. App. 5th Dist. January 3, 2019). Petitioner

26   also pleaded no contest to possession of a firearm by a felon (§ 29800, subd. (a)(1)). Id. The court

27   sentenced Petitioner to 9 years plus 65 years to life. Id. at *2. The Fifth DCA remanded the matter for

28   sentencing issues but affirmed the conviction otherwise. Id. at *3.

Petitioner filed the instant habeas petition on June 21, 2019. (Doc. 1.) Respondent filed its answer on September 6, 2019. (Doc. 11.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

### The Hinton Center event

On the afternoon of Sunday, March 23, 2014, Herman Tatum and his father went to a "Stop the Violence" gathering at the Hinton Center in Fresno. There were 20 to 30 people there. Herman and his father talked to friends and relatives, stayed for about 30 to 45 minutes, and then Herman went home.

Alberta Malone also attended the event and took photographs of everyone having a good time. One of the photographs showed defendant was at the event. There is no evidence that defendant and Herman interacted in any way at the event.

### The Crossroads bar

Later that evening, Herman was at home with his wife, Janee. Herman was a long haul truck driver and scheduled to leave the next day. Janee suggested that they go to The Crossroads bar as something fun to do that night. Herman agreed.

Herman and Janee arrived at the bar sometime between 10:00 p.m. and 11:00 p.m. The bar was located in a small shopping center at the corner of Cedar and Shields in Fresno. The bar's interior was separated in certain segments. At the entrance door, there was a curtained foyer followed by a dance floor, a barrier wall around the dance floor, a stage for the band, and a U-shaped bar.

Herman testified that he was carrying a .45-caliber Glock handgun in a holster on the right side of his belt, and the holster was inside his waistband. His shirt was hanging over his belt and covered the gun holster. The gun was loaded but not cocked. He did not have a concealed weapons permit. Herman testified he had lawfully purchased the gun, and always carried it because he felt it would protect his family. Herman and Janee belonged to a hunting club.

Herman testified there were 20 to 30 other patrons at the bar, including about half the people who had been at the Hinton Center event. Everyone "pretty much knew each other ... but everybody is not friends."

### Defendant's statements to Janee and Herman

Herman testified about what happened at the Crossroads that night. Herman was

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

standing by the bar and talking to a friend. Janee was standing two feet behind Herman.

Defendant walked between Herman and his friend. Herman did not know defendant but recognized him because defendant had been at the Hinton Center event earlier that day.

Herman testified that defendant started to talk to Janee and said to her, "'Hey, I want to talk to you outside.'" Janee turned around and told defendant, "'Hey, I'm married. I don't do that.'"

Defendant walked to Herman's side and tapped him on the shoulder. Defendant asked Herman, "'Hey, is this your girl?'" Herman testified he replied in a "joking" way, "'No, it's my wife.'"

Herman testified defendant asked, "'Hey, is this your wife?'" Herman again said she was his wife. Defendant said, "'You know who I am?'" Herman said no.

Herman testified he extended his hand, introduced himself, and tried to shake defendant's hand. Defendant did not shake his hand. Defendant said, "'Nah, we are going to leave it at that,'" turned around, and said it was okay. Herman also said it was okay. Herman testified he never pulled his firearm at that time because they did not argue, and he thought the exchange ended. He never lifted his shirt to show the gun to defendant.

Herman testified Janee told him to get another drink and then they could leave. Herman asked the bartender for two more drinks and resumed his conversation with his friend.

**Defendant shoots Janee and Herman**

When the drinks were ready, Herman turned to the bar to get them. Janee was still standing in the same place. Herman never saw her talk to defendant. Herman looked to the left and saw defendant rocking back and forth. Herman was not concerned about defendant's behavior because music was playing in the bar.

As Herman picked up the drinks, he heard someone say, "'Now what, you bitch-ass n[****]r?'"

Herman turned around and saw defendant and realized defendant had made the statement. Herman did not know why defendant said that. Defendant was standing in the same place and still rocking back and forth. Defendant's right hand was extended, and he was holding a handgun. Herman testified that he looked at defendant, but defendant "wasn't pointing [the gun] at me, though. He never pointed it at me. He had it pointed at Janee."

Herman testified he made "a left turn very fast" and tried to use his right hand to knock the gun out of defendant's hand. "My purpose of doing that is so I can get to my wife. I figured if I can cover up my wife, anything I needed to do after that I could do." Herman took two large steps toward defendant, spun around, and his left elbow made contact with defendant's right hand.

3

Herman thought he had knocked the gun out of defendant's hand and tried to get to Janee to cover and protect her. Herman testified defendant never dropped the gun but held onto it. Defendant regained control of the gun and "[r]epositioned his grip." Defendant stepped to the right "and he fired, boom."

As the first shot was fired, Herman testified he was "running towards" Janee and "reaching out to grab her" with his right hand. Herman was "maybe a step, step and a half off" and "grabbed her elbow. I barely got my fingers on her, and I was trying" to "throw my left arm over" to cover her body.

Herman testified that Janee fell backwards before he could reach her. Herman heard a couple more gunshots. At that point, Herman realized he was also hit and fell to the floor. Once he landed on the floor, Herman pulled out his own handgun, cocked it, and looked for defendant but he was gone. Herman was positive that defendant never saw that he was carrying a gun.

Herman held Janee on the floor and realized she had been shot in the head. She was bleeding very badly. Herman's neighbor approached and stood over them. Herman handed his gun to the neighbor and told him to take it home. "I mean, what else can I do with it? I mean, I hadn't fire[d] it. I didn't do nothing with it."

Herman testified defendant shot them about 30 minutes after defendant made his initial statements to them. Herman did not notice if defendant walked in and out of the bar before the shooting because he was not paying attention to him.

### The victims' injuries

The police received a dispatch to respond to the bar at 11:09 p.m., and Herman and Janee were immediately transported to the hospital.

Janee had been shot once in the head. The bullet entered the front of her forehead, fractured her skull, continued to the top portion of her head and through the soft tissue, and resulted in bleeding outside and under the brain. She lapsed into a coma within a few minutes of the injury. There was no gunshot residue or stippling on her forehead, indicating the gun was fired at least two to three feet away from her. Janee died at the hospital after being on a respirator for a few days.

Herman was shot twice and wounded in his back and lower buttocks. The wounds were about 12 inches apart. He had surgery to remove the bullets and was in the hospital for three days. Herman was unable to work for nine months because of his injuries. At the time of trial, he sometimes had difficulty standing, his leg locked at times, and he could not squat down.

### The investigation

The officers found four nine-millimeter shell casings on the floor of the bar. There was a fresh bullet hole through the wall of a store room.

An officer spoke to Herman at the hospital and obtained a statement about what happened. The police also interviewed other patrons at the bar and obtained a physical description of the gunman.

The officers learned from witnesses in the bar that earlier in the evening, the possible gunman had been at a liquor store located in the same shopping center. The police obtained surveillance video from the liquor store and obtained a still photograph of a man who matched the witnesses' descriptions of the gunman. The police also examined Alberta Malone's camera and found a photograph of someone who resembled the person in the surveillance video.

Based on this information, the police prepared a photographic lineup that included defendant's picture and showed it to Herman and other witnesses at the bar. Defendant was identified as the gunman.

**Arrest of defendant**

On May 2, 2014, defendant was arrested at an apartment in Cleveland, Ohio, by officers attached to the Federal Bureau of Investigation's violent crime task force. Defendant was held in custody at the Cuyahoga County Jail. Defendant made a telephone call from jail to someone on the same day that he was arrested. Defendant's call was monitored, and officers heard defendant make statements about the possible location of a gun.

A few hours after he was arrested, the officers returned to the Cleveland apartment where they had found defendant. The officers discovered a nine-millimeter handgun that was under the plastic liner of a bathroom trash can. There was one bullet in the chamber and additional bullets in the magazine.

**Firearms evidence**

A criminalist compared the four nine-millimeter casings found on the bar's floor with the nine-millimeter handgun recovered from the Cleveland apartment where defendant was arrested.

The criminalist testified she identified three casings as being fired from that nine-millimeter handgun.

The fourth casing "had the same class characteristics," but there were not enough details to say "with absolute certainty" that it was also fired from defendant's gun. The criminalist testified it was "possible" the fourth casing was fired from another nine-millimeter weapon but explained the fourth casing "most likely" was fired from defendant's gun and there just "was not enough there in detail for me to call it an identification."

The police also recovered Herman's .45-caliber Glock pistol that he had at the bar and gave to his neighbor. The criminalist examined Herman's Glock handgun and compared it with the four casings found in the bar. She testified that none of the casings were fired

from the .45-caliber Glock handgun because of "[t]he differences in caliber, so those cartridge cases could not have been fired from that Glock. They were .9mm caliber, which is much smaller diameter than .45 caliber pistol."

**Prosecution evidence from other bar patrons**

Tony Ortega testified he was at the bar and talking to friends. A disc jockey was playing music. Ortega did not hear any loud arguments or disturbances. After he had been at the bar for about 30 minutes, the music suddenly stopped, and he thought the speaker had blown out. He then heard gunshots. Ortega looked up and saw a man firing a gun. Ortega later identified defendant as the gunman. Defendant's right hand was fully extended as he fired. Ortega heard three to five gunshots and saw a couple of flashes. Ortega could not see who defendant was firing at. After he fired the final shot, defendant walked out of the bar, and he was still carrying the gun. Ortega did not know him and had never seen him before. Everyone was screaming and running after the shots were fired. Ortega did not see anyone else with a gun.

Feliza Banuelos testified she was sitting at the bar and saw a man with dreadlocks walk out of the building and then return. The man again walked out and then came back inside. When he returned the second time, he was holding a handgun and started shooting. She did not know the gunman. She ducked down and did not see what happened. She did not hear any arguments before the gunshots and did not see anyone else with a gun.

Alberta Malone testified about taking photographs at the Hinton Center event; she further testified that defendant was also at the Hinton Center. Malone was also at the Crossroads that night and took additional photographs at the bar. One photograph showed Herman and Janee standing together. Malone testified that she heard gunshots and immediately went down to the floor. She did not hear any arguments or yelling before the gunshots. She later gave her camera to the police.

**DEFENDANT'S TRIAL TESTIMONY**

Defendant testified at trial about the shooting. He went to the "Stop the Violence" event at Hinton Center earlier that day. He was wearing a T-shirt that said "Nothing but love Fresno" that he previously bought from someone who was throwing the event. He stayed at the event for several hours, ate food, and drank two or three beers.

Defendant testified he was armed with a buck knife and a nine-millimeter handgun that day. He carried the gun because of the violence in the area, and to protect himself from "indirect" threats he had received. Defendant testified he previously obtained the gun "from the streets" and had stored it "in an abandoned house." The gun was loaded, but he could not remember where he got the ammunition. Defendant put the gun in his waistband and covered it with his shirt.

Later that evening, defendant went to the Crossroads with some people who had been at the Hinton Center event. He briefly stopped at a nearby liquor store to buy cigarettes.

He smoked a cigarette outside and then went into the Crossroads. Defendant testified he sat with his friends by the bar and drank a shot of Hennessey.

Defendant testified another friend invited him to go outside and smoke marijuana. Defendant agreed and hurried to finish his drink. Defendant left the bar area and headed toward the door. Defendant testified he walked by Janee. Herman spun around and blocked defendant's path. Defendant testified he had never met Herman or Janee, he did not know them, and he did not see them at the Hinton Center event.

Herman asked defendant what he said to his wife. Defendant replied that he did not say anything to her. Janee approached Herman and said, "'Man, hold on, you tripping,'" and grabbed Herman's arm. Herman told defendant, "'Yeah, you better not have say nothing to my wife.'"

Defendant testified Herman "started to get angry like provoking or trying to just — telling me as far as getting real hostile."

Defendant testified he backed away from Herman and Janee; he did not ask Herman if he knew who he was. A man who had been sitting at the corner of the bar got up and stood between defendant and Herman. Defendant kept backpedaling. Herman came at defendant in an aggressive manner and cursed him.

Defendant testified that Herman pulled a nine-millimeter "Glock 9" from the side of his hip. Herman pointed the gun at defendant.

Defendant testified he feared for his life and pulled his own gun. Defendant ducked down low, so Herman could not see him. Herman did not try to slap the gun out of his hand. Herman put his drink down and turned. Janee was "flying that way towards where I had just walked from." Defendant testified he fired three shots. He fired once while crouched down low, and then fired two more shots.

Defendant testified he fired in self-defense. He was afraid Herman was going to shoot him before he could shoot Herman. Defendant was stunned that he had just shot a man, and he walked out of the bar. He had no idea that Janee was hit by a bullet.

Defendant insisted he did not fire the bullet that hit Janee in the head and killed her.

After the shooting, defendant took the train to Cleveland to get away "from all the riff raff." He stayed with the sister of his brother-in-law, and put his gun in a garbage can. Defendant learned Janee had been killed. He was "stunned" and knew he "didn't do it."

### *Cross-examination*

Defendant admitted he was also known as "Crazy," and a similar nickname was on the shirt that he was wearing at the bar. Defendant testified that he believed there was a plot against him that day but conceded that Herman and Janee were not involved in the plot,

and he did not know them. Defendant testified that Herman was angry and aggressive, and used a loud voice. Defendant was trying to calm things down.

Defendant believed Herman fired a shot, but he was not wounded.

"Q. Now, is it your testimony that Herman fired a shot, one or more shots at you, is that your testimony?

"A. He shot one that I know of. I don't know, probably one shot at most."

Defendant was "probably" aiming at Herman when he fired the first shot. "[I]t was low. I don't know if I was aiming exactly at — I couldn't get it out — I was just moving up— moving it up, coming up with it. So I don't know if it — I was trying to aim at him."

"Q. You intentionally pulled the trigger, right?

"A. Yeah.

"Q. You know what happens when you pull a trigger to a loaded gun, right?

"A. Yeah.

"Q. You know pointing a loaded gun at someone and shooting them, there's a chance you can kill someone, right?

"A. There's a chance, probably, yes.

"Q. Well, my question is if your testimony is that Herman — you only did that because he was pulling a gun, were you trying to kill him, were you trying to put him down?

"A. I was trying to stop him from shooting me.

"Q. And how did you do that?

"A. Pointing my gun and shooting back."

Defendant insisted he saw Herman holding a gun and pointing it at him before he reached for his own gun.

"[H]e pulled his gun, as he is pulling his gun out, brandishing it, that's when I went for mines [*sic*]. He come up, point it at me, so I had came up like this. I couldn't even get it all the way up yet. He already had the gun on me. He already had everything on me, you know."

Defendant testified that he only fired after he heard a gunshot.

"Q. It's your testimony that [Herman] fired first?

8

"A. Yeah, I heard the shot, so I fired."

Defendant was not sure if he shot Herman, but again insisted he did not shoot Janee.

Also, on cross-examination, the prosecutor asked defendant about statements he made to detectives during his post-arrest interview in Cleveland. Defendant admitted that he told the detectives that he fired two shots, but he testified at trial that he fired three shots. Defendant insisted he told the detectives that Herman had a "Glock 9." Defendant was asked to review the transcript of his post-arrest interview to show where he made that statement and what other details he gave about Herman's gun. Defendant said he could not remember.

The defense rested.

## THE PROSECUTION'S REBUTTAL EVIDENCE

### Defendant's postarrest interview

In rebuttal, the prosecution introduced the audiotape of defendant's postarrest interview, which occurred on the evening of May 4, 2014, at the Cuyahoga County Jail. Fresno Police Detectives Ruiz and Gebhart conducted the interview. Defendant was advised of the *Miranda* warnings and agreed to answer questions.

### *The car wash and Hinton Center*

The detectives asked defendant about the shooting. Defendant said it started before the shooting happened, he had nothing to hide, and he wanted to tell them what he had been through.

Defendant said two days before the shooting, George Travis called him and said he had made defendant a shirt. The shirt said something about loving Fresno and the name "Craigzo." Travis demanded $10 for the shirt and defendant paid him. Defendant thought it was a "shady" deal.

Defendant said he was invited to make an "appearance" at a car wash and car show that had been organized in response to violent activity in West Fresno. He was asked to attend because he had a "voice" and "respect" in the community. The car wash occurred on the morning of the shooting. Defendant went to the car wash and was wearing the shirt. Defendant said "negative" people from gangs started to show up. Defendant was not looking for any trouble and did not want to be tied up with the negative lifestyle.

Defendant left the car wash with a friend, who dropped him off at the Hinton Center event. Defendant was carrying a buck knife that day because he stayed prepared all the time. The event at the Hinton Center started getting bigger, and defendant was "on edge" and "watching everything." There were people at the event who had issues with other members of his family. Some people warned him to be careful and watch out for himself.

Defendant felt people were looking at him. He believed there was a plot against him and someone was out to kill him.

### *Defendant gets his gun*

After getting the warnings, he left the Hinton Center and decided to protect himself. He retrieved an older nine-millimeter handgun that he kept in an abandoned house that used to belong to his grandmother. Defendant had obtained the gun years ago and never carried it. He got the gun that day because he realized that "[t]hey ain't going to come at me with a knife," and he wanted to be prepared. Defendant tucked the gun inside his waistband. It was loaded and cocked. "[S]omething told me, man, man, get that gun."

Defendant said a friend wanted him to go to the Crossroads bar, and he felt the friend might be in on the plot against him. Defendant did not usually go to clubs but decided to go that night. He had the gun in his waistband.

### *Defendant goes to the bar*

Defendant got a ride to the bar. He thought it looked "real shady." Defendant felt there were people at the bar who did not want him there, but he also knew some of the patrons. Defendant stood by the bar and his friend George invited him to go outside and smoke a marijuana cigarette. Defendant finished drinking a shot of Hennessy and started to follow George to the door. Defendant said Anthony, another friend, was behind him.

Defendant said as he walked away from the bar area, he saw a man and woman that he did not know. The detectives showed photographs of Herman and Janee to defendant. Defendant identified Herman as the man but said he did not know him. Defendant said he had never seen Janee and did not recognize her from the photograph.

### *Defendant says Herman pulled a gun*

Defendant said Herman reached for the right side of his waist and pulled out a black gun. Defendant could not tell if Herman's gun was a semiautomatic or a revolver. "It was either black — I don't believe — I know it was a gun."

Defendant said Herman held the gun, acted aggressive, and asked defendant a couple of times what he said to his wife. Defendant replied that he did not say anything to his wife. Herman cursed him. Defendant backed away from Herman, again said he did not talk to his wife, and told Herman to calm down. Defendant told the detectives that he never talked to Janee and he was not "egging" Herman on.

Defendant said it "dawn[ed] on me. This is what these dudes were telling me." Defendant said his friend George could have said something to the woman, and Herman could have associated defendant with George, but he did not know for sure.

### *Defendant fires his gun*

Defendant said Herman raised his body, turned, and pointed the gun at defendant. They were 10 to 15 feet away from each other.

The detectives asked defendant if Herman fired his gun. Defendant said, "I don't know, I think he did. I'm not sure."

Defendant said he fired his own gun and thought he fired two shots. Defendant could not remember if he heard any shots before he fired his own gun: "I think he tried to shoot before — he — I could shoot one off on him. I think." Defendant also said, "I don't know if he tried to fire or what. All I know, I was just — just started shooting."

Defendant said he was looking at Herman when he fired his gun. Herman turned away and it looked like he was grabbing someone. Defendant did not see if Herman grabbed a woman.

Defendant said he immediately ran away from the bar after he fired the two shots. He kept the gun with him. Defendant was scared because Herman tried to kill him, and he thought the people in the bar set him up like he had been warned.

### ***Defendant goes to Cleveland***

Defendant said he got on the train in Fresno the next morning. He used an alias and put the gun in a bag with his clothes. He went to Reno for one day, and then reached Cleveland two and one-half days later. He left town because people tried to kill him, he knew he shot the man, and "it all started coming together."

Defendant told the detectives that he had been staying with a friend in an apartment in Cleveland.

"[Q.] Okay. You obviously had the gun there.

"[A.] Yeah, *I don't know where it's at*."

On further questioning, defendant admitted he took the gun into the apartment. The detectives ultimately advised defendant that the police found a gun in the trash can and asked if it was the same gun. Defendant said it probably was.

Defendant said that while he was staying at the apartment, he heard that two people had been shot at the bar, the woman had died, and "they were saying that Craigzo" did it. Defendant was confused because he knew he shot the man but he "didn't shoot no woman. I don't know if — *if one of the bullets probably sprayed and hit her, I don't know*." (Italics added.)

"[Q]: You were trying to shoot at who...?

"[A]: The dude that pulled the gun on me.... [¶] I tried to get back before he could get me."

11

Defendant said he cried when he learned the woman died and wanted to turn himself in. Defendant remained in Cleveland and was arrested at the apartment. He falsely said his name was "Anthony Smith" when the police arrived because he did not want to go to jail.

As the interview ended, defendant told the detectives that he knew he was in trouble but had been 100 percent accurate in his statement about the shooting. "I pull[ed] ... my weapon 'cause he pulled one .... That's all I seen was he was going to shoot me. If I wouldn't have had that gun, I would have been shot."

**Additional rebuttal evidence**

The prosecution also called additional witnesses on rebuttal. Detective Gebhart testified he interviewed Herman five times about the shooting. Herman never said he pulled out his gun before he was shot by defendant.

Elisa Nickles testified she was washing dishes at the Crossroads bar when the shooting happened. She did not hear any arguments or fights before the shooting. She dropped to the floor when she heard the gunshots. She heard three or four shots. She told the police that the gunman was a black male adult with salt and pepper dreadlocks.

Luis Rico was the disc jockey at the bar that night. He heard noises and thought his sound equipment was malfunctioning. Rico looked up and saw someone shooting. At trial, Rico positively identified defendant as the gunman. Defendant's arm was extended straight out, and he sprayed gunshots from right to left. Rico went down for cover. He heard between six to eight gunshots. Rico testified defendant ran out of the bar after he finished shooting. Rico did not see anyone else fire a gun that night.

Juan Sandoval was at the bar with friends. He did not know defendant, Herman, or Janee. One of his friends pointed to defendant and said that man had argued with another person earlier in the evening. Sandoval testified he heard a gunshot, looked up, and saw defendant "with his arm pointed outward." Sandoval heard and saw a second flash; he grabbed two ladies who were with him and pushed them to the floor. Sandoval heard a couple more rounds. Sandoval heard a total of four shots. He did not see anyone else with a gun.

Adelesmo Cazares was the bar manager at Crossroads. He was standing at the end of the bar before the shooting happened. The music was loud, but he heard an argument behind him. There were two men talking, but it "escalate[d] a little higher." Cazares turned around to look and saw a gun flash. He only saw one muzzle flash and then took cover on the floor. He heard four shots. He did not see the gunman but described that person's clothing to the police. He did not see anyone else with a gun that night.

Phillip Colmenero was at the bar that night and met Herman and Janee for the first time. Colmenero was helping the bartender when someone tapped him on the shoulder and told him to "'watch out ... for the guy behind you.'" He did not hear any commotion.

12

Colmenero then heard a woman say, "'Hey, the guy had a gun.'" Colmenero was shocked because that was not normal.

"And then a few seconds later, you know, I heard, 'Do you know who the f[**]k I am?' 'No.' 'Okay. Well —' You know, I didn't really pay attention to it at the time. I was just — maybe someone was just talking loud, or whatever, singing a song — I don't know. Things happened so quick. It just — as soon as I turned around all I seen was flashes."

Colmenero testified that just before he heard the gunshots, he saw Herman raise both of his hands, palms out close to his body, as if he was trying to calm down the second person and protect himself. Colmenero heard four shots. He did not see the gunman's face. He never saw Herman with a gun. Colmenero could not remember the details of his prior statement to the police.

Detective Gebhart testified that he interviewed Colmenero, who said that Herman held out his hands and tried to calm down defendant during a verbal exchange. Colmenero said that as Herman tried to calm him down, defendant said, "'F[**]k that,'" and "'Why you tripping for? What — don't — don't be tripping like that.'" Colmenero said defendant also said, "'What, mother f[**]ker? Who is tripping now,'" and then defendant pulled out his gun and started shooting. Colmenero said he never saw Herman fire a gun.

The criminalist again testified in rebuttal about the four casings recovered from the bar, and that she determined three casings had been fired from defendant's nine-millimeter handgun. The criminalist testified the fourth casing was "most likely" fired from the same gun, but that casing did not have sufficient markings to make an identification.

The criminalist testified the four recovered casings had head stamps that said "CBC," indicating a Brazilian manufacturer, which was not a common brand of ammunition. The criminalist testified that defendant's nine-millimeter handgun that was found in the Cleveland apartment was loaded with nine rounds, and all the rounds were also marked "CBC."

## The charges and instructions

Defendant was charged with count 1, murder of Janee; and count 2, attempted murder of Herman. As to counts 1 and 2, it was alleged that appellant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

The jury was instructed on the general principles of homicide — that defendant was charged with murder; manslaughter was a lesser included offense to murder; and that a homicide could be lawful or unlawful.

"If a person kills with a legally valid excuse or justification, the killing is lawful, and he or she has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful."

The jury received CALCRIM No. 505 on justifiable homicide and self-defense.

"The Defendant is not guilty of murder or manslaughter or attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense. The Defendant acted in lawful self-defense if, one, the Defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; two, the Defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and, three, the Defendant used no more force than was reasonably necessary to defend against the danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The Defendant must have believed there was imminent danger of death or great bodily injury to himself. The Defendant's belief must have been reasonable and he must have acted only because of that belief. The Defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the Defendant used more force than was reasonable, the killing or attempted killing was not justified.

"When deciding whether the Defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the Defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the killing or attempted killing was not justified. If the People have not met this burden you must find the Defendant not guilty of Murder or Manslaughter or Attempted Murder or Attempted Voluntary Manslaughter."

The jury was instructed with CALCRIM No. 520 on the elements of count 1, murder.

"To prove that the Defendant is guilty of this crime, the People must prove that; one, the Defendant committed an act that caused the death of another person; two, when the Defendant acted, he had a state of mind called malice aforethought; *and three, he killed without lawful justification.*" (Italics added.)

CALCRIM No. 520 also defined express and implied malice.

The court gave CALCRIM No. 562 on transferred intent:

"If the Defendant intended to kill one person, but my mistake or accident killed someone else instead, *then the crime, if any, is the same as if the intended person had been killed.*" (Italics added.)

This instruction was followed by CALCRIM No. 571, defining voluntary manslaughter based on imperfect self-defense:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the Defendant killed a person because he acted in imperfect self-defense.

"*If you conclude the Defendant acted in complete self-defense, his action was lawful, and you must find him not guilty of any crime*. The difference between complete self-defense and imperfect self-defense depends on whether the Defendant's belief in the need to use deadly force was reasonable.

"The Defendant acted in imperfect self-defense; if, one, the Defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and two, the Defendant actually believed that the immediate use of deadly force was necessary to defend against the danger, but three, at least one of those beliefs was unreasonable." (Italics added.)

CALCRIM No. 571 further stated:

"Imperfect self-defense does not apply when the Defendant through his own wrongful conduct has created circumstances that justify his adversary's use of force."

CALCRIM No. 600 defined the elements of count 2, attempted murder, and that the People had to prove the defendant took a direct but ineffective step toward killing another person and the defendant intended to kill that person.

CALCRIM No. 604 defined attempted voluntary manslaughter based on imperfect self-defense.

"An attempted killing that would otherwise be Attempted Murder is reduced to Attempted Voluntary Manslaughter if the Defendant attempted to kill a person because he acted in imperfect self-defense.

"If you conclude that the Defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the Defendant's belief in the need to use deadly force was reasonable.

"The Defendant acted in imperfect self-defense if the Defendant took at least one direct, but ineffective step toward killing a person; two, the Defendant intended to kill when he acted; three, the Defendant believed that he was in imminent danger of being killed or suffering great bodily injury; four, the Defendant believed that the immediate use of deadly force was necessary to defend against the danger; but, five, at least one of the Defendant's beliefs was unreasonable."

Finally, the jury was instructed that voluntary manslaughter was a lesser included offense of count 1, second degree murder, and attempted voluntary manslaughter was a lesser included offense of count 2, attempted murder.

**Closing arguments**

The prosecutor's theory was that defendant made a pass at Janee, and he got mad when Janee turned him down and Herman said Janee was his wife. The prosecutor argued defendant intentionally shot both Janee and Herman, the uncontroverted physical evidence showed he shot Janee in the head and Herman in the back, and he did so without any lawful excuse or justification.

The prosecutor explained there were three theories to find defendant guilty of the murder of Janee: express malice, implied malice, and transferred intent. The prosecutor argued there was evidence of defendant's express malice and intent to kill based on Herman's testimony that defendant pointed the gun directly at Janee before he fired the first shot. There was evidence of implied malice, that defendant deliberately performed an act, the natural consequences of which was dangerous to life, by intentionally pointing the gun and firing it "in the direction of at least one, if not many more people."

The prosecutor's third theory was based on transferred intent, if defendant aimed at Herman as a result of their verbal dispute, and "Janee was simply a mistake or accident or unintended target."

"If the Defendant intended to kill Herman, and he harbored that state of mind, malice aforethought, towards Herman, but accidentally ... shot ... Janee, that intent follows the bullet, he intends to kill Herman, Janee is in the background. If he intended on killing Herman and Janee was simply an accident, it's still a murder. That intent transfers from Herman to Janee."

The prosecutor acknowledged that if the homicide was committed in self-defense, then it was lawful; or if malice was negated by imperfect self-defense, then the crime was voluntary manslaughter.

"In this case, there was no right to self-defense because there was no danger to the Defendant. Herman did not pull his firearm. Herman did not display his firearm. Therefore, criminal liability attaches." The prosecutor argued defendant's claim of self-defense was not credible given his immediate flight to Cleveland, that he gave a false name when he was arrested, and he told the officers that he did not know where the gun was. The prosecutor noted defendant's postarrest statements that he believed there was "an intricate plot" to kill him, but there was "zero evidence" that Janee or Herman knew who he was.

As for count II, attempted murder, the prosecutor argued defendant's intent was "very clear" because he fired multiple shots and hit Herman twice in his "center body mass. He wanted to put him down."

Defense counsel argued defendant's claim of self-defense was credible because Herman escalated the dispute between defendant and Janee and became angry. Herman admitted he had a gun at the bar, and the criminalist could not confirm that the fourth casing was fired from defendant's gun. Counsel acknowledged that Herman said he had a .45-caliber Glock but asserted that Herman may not have been truthful about the weapon since he admitted that he handed it to his neighbor to hide, and it could have been cleaned before

the police found it. Counsel noted that defendant consistently stated he did not shoot Janee and argued Herman could have had a nine-millimeter Glock handgun that fired the fourth casing.

Counsel further argued defendant was not being untruthful during the post-arrest interview when the officers asked about the location of his gun, since he was in jail and could not have known what happened to the gun after he was arrested.

Defense counsel argued there was clear evidence of self-defense because defendant saw Herman pull the gun, and defendant believed Herman was going to shoot him if he did not shoot first. "He believed reasonabl[y] or unreasonabl[y] that Herman was going to kill him if he didn't shoot the gun first, so he shot Herman first." Counsel argued it was perfect self-defense since defendant believed Herman was going to shoot him, and he was not guilty of murder.

Defense counsel argued that if the jury did not find perfect self-defense, but instead decided that "Herman did something with the gun at the time of the shooting, then [defendant] can be put in a position where he unreasonably believed, but didn't necessarily believe to shoot Herman was the right thing to do because otherwise he was afraid Herman was going to shoot him," and he was guilty of voluntary manslaughter instead of murder.

**Convictions and sentence**

On May 9, 2016, after a jury trial, defendant was convicted of count 1, second degree murder; and count 2, attempted murder; the jury found the deadly weapon enhancements true. Defendant pleaded no contest to count 3, felon in possession of a firearm.

On October 26, 2016, the court sentenced defendant to state prison for a determinate term of nine years plus 65 years to life as follows: 15 years to life for count 1, second degree murder, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement; a consecutive upper term of nine years for count 2, attempted murder, plus 25 years to life for the firearm enhancement; and a concurrent upper term of three years on count 3, felon in possession of a firearm.

The court imposed a restitution fine of $10,000 (§ 1202.4) and suspended the parole revocation fine (§ 1202.45). The court also ordered defendant to pay $5,000 to the Victim's Compensation and Government Claim Board, for reimbursement of funeral expenses for Janee; and reserved further victim restitution.

Foster, 2019 Cal. App. Unpub. LEXIS 92, at *3-37.

**III.    DISCUSSION**

A.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to

the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that

18

the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Petition

Petitioner raises the following claims in his petition: (1) Petitioner asserts his trial attorney was ineffective because he failed to move for an acquittal of count II (attempted murder) after the prosecution rested their case; (2) Petitioner contends that the trial court should have given the jury an amplified instruction on transferred intent; and (3) Petitioner claims that the trial court erred in giving a supplemental instruction on imperfect self-defense.

19

1.    Ineffective Assistance of Counsel

Petitioner asserts his trial attorney was ineffective because he failed to move for an acquittal of count II (attempted murder) after the prosecution's case-in-chief. In the last reasoned decision, the Fifth DCA denied the claims as follows:

> Defendant contends his defense attorney was prejudicially ineffective because he failed to move for an acquittal of count II, attempted murder of Herman, after the People introduced evidence in the case-in-chief and rested.
>
> Defendant correctly notes attempted murder can only be based on express malice and intent to kill. Defendant argues there was no evidence of these elements introduced in the People's case-in-chief, since Herman's testimony was the only evidence about the shooting that was introduced at that stage, and Herman testified that defendant pointed the gun directly at Janee. Defendant argues that Herman never testified that defendant pointed the gun at him. Defendant further argues that since transferred intent does not apply to attempted murder, the evidence would not support attempted murder even if defendant aimed the gun at Janee and unintentionally hit Herman.
>
> Defendant thus concludes that if defense counsel had moved for acquittal on the attempted murder charge after the People rested, the trial court would have granted the motion given the lack of evidence about his express malice and intent to kill Herman. Defendant acknowledges that additional evidence on these elements was introduced in the defense case and on rebuttal. However, defendant declares that counsel's alleged error to move for acquittal was prejudicial, and this court must reverse his conviction for attempted murder of Herman.
>
> Defendant further argues that counsel's alleged error also requires reversal of his conviction for the second degree murder of Janee. In making this argument, defendant shifts his focus from the People's case-in-chief to the prosecutor's closing argument, where he relied on three theories to support the murder charge: express malice, implied malice, and transferred intent — that defendant may have intended to shoot at Herman because of their verbal dispute and instead hit Janee, and defendant would be guilty of Janee's murder based on his transferred intent to kill Herman. Defendant contends that if the attempted murder charge had been dismissed for insufficient evidence, then the jury would not have been able to consider transferred intent as the basis for the second degree murder of Janee. Defendant concludes that since there were no special verdict forms, it is impossible to determine which theory the jury relied on when it convicted him of murder, so this court must also reverse the second degree murder conviction of Janee.
>
> "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214-215, 66 Cal. Rptr. 2d 123, 940 P.2d 710.) The failure to raise a meritless objection or motion is not ineffective assistance of counsel. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90, 145 Cal. Rptr. 3d 67.)
>
> As we will explain, defense counsel was not prejudicially ineffective when he failed to move for an acquittal because the evidence introduced during the People's case-in-chief

supported the attempted murder charge.

## A. Motion for Acquittal

"'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review. [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200, 59 Cal. Rptr. 3d 196, 158 P.3d 763.)

"An appellate court reviews the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215, 144 Cal. Rptr. 3d 716, 281 P.3d 799.) "Review of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point. [Citation.]" (*Ibid.*)

## B. Murder and Malice

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) A murder committed with premeditation and deliberation is first degree murder; all other kinds of murder are of the second degree. (§ 189.)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. [Citations.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 151, 59 Cal. Rptr. 3d 157, 158 P.3d 731; *People v. Elmore* (2014) 59 Cal.4th 121, 133, 172 Cal. Rptr. 3d 413, 325 P.3d 951.)

Malice may be express or implied. (*People v. Swain* (1996) 12 Cal.4th 593, 601, 49 Cal. Rptr. 2d 390, 909 P.2d 994.) Express malice exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) "Malice is implied ... when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 596, 47 Cal. Rptr. 3d 22, 139 P.3d 492.)

## C. Attempted Murder, Intent, and Express Malice

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623, 3 Cal. Rptr. 3d 402, 74 P.3d 176.)

"'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice — a conscious disregard for life — suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.] Hence, in order for

defendant to be convicted of the attempted murder of the [victim], the prosecution had to prove he acted with specific intent to kill that victim. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739, 37 Cal. Rptr. 3d 163, 124 P.3d 730 (*Smith*).)

"Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.] To be guilty of attempted murder of the [victim], defendant had to harbor express malice toward that victim. [Citation.] Express malice requires a showing that the assailant '"'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]"' [Citations.]" (*Smith, supra*, 37 Cal.4th at p. 739.)

"The mental state required for *attempted* murder is further distinguished from the mental state required for murder in that the doctrine of 'transferred intent' applies to murder but not attempted murder. [Citation.] 'In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder.' [Citation.] In contrast, the doctrine of transferred intent does not apply to attempted murder: 'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' [Citation.] Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' [Citation.]" (*Smith, supra*, 37 Cal.4th at pp. 739-740, original italics.)

"Last, the crime of attempted murder is not divided into degrees. [Citation.] The prosecution may seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement [citations]." (*Smith, supra*, 37 Cal.4th at p. 740.) If such a finding is not sought, "the prosecution had only to prove that defendant purposefully shot at the [victim] with express malice in order to establish the requisite state of mind for conviction of attempted murder." (*Ibid.*)

While motive is not an element of a criminal offense, evidence of motive "is often probative of an intent to kill." (*Smith, supra*, 37 Cal.4th at pp. 740-741.) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945, 2 Cal. Rptr. 2d 629.)

"[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although ... where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive — the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill. [Citation.] Where attempted murder is the charged crime because the victim has survived the shooting, this principle takes on added significance. Finally, even if the shooting was not premeditated, with the shooter merely perceiving the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 742.)

### D. Analysis

We set forth the factual statement based on the sequence in which the parties introduced the evidence, in order to address defendant's claim that the prosecution failed to introduce evidence in its case-in-chief to support count 2, the attempted murder of Herman based on express malice and intent to kill.

In the case-in-chief, Herman was the primary witness who testified about the circumstances of the shooting. Herman testified that immediately before he heard the first shot, defendant made a challenging and confrontational statement. Herman turned around and saw defendant. He testified that defendant's right hand was extended, and he was pointing a gun aimed at Janee.

Defendant argues that Herman gave the only testimony about the actual shooting when he said: "[Defendant] never pointed it at me. He had it pointed at Janee." Defendant thus asserts there was no evidence that defendant pointed the gun at Herman to support the express malice and intent to kill required for attempted murder.

Herman could not testify whether defendant was aiming the gun at him because his back was turned at the moment he was shot. However, the entirety of the evidence supported the elements of express malice and intent for the attempted murder of Herman. Defendant and Herman had exchanged words when defendant tried to pick up Janee. Immediately before defendant fired the first shot, Herman heard him utter the confrontational statement. Despite Herman's efforts to knock the gun away and protect Janee, defendant regained control of his weapon, stepped to the right, and aimed his gun at Janee. The evidence strongly indicates defendant's first shot hit Janee in the front of her head as Herman was trying reach her, because she fell down and Herman tried to help her. Nevertheless, defendant kept shooting. Herman's back was the only target that was still in front of defendant in the relatively confined area of the bar. Herman heard more shots and realized he had also been hit. Defendant shot Herman twice in the middle of his body mass.

There was additional evidence in the prosecution's case-in-chief to support the inference that defendant fired directly at Herman. Tony Ortega, a bar patron who testified in the prosecution's case-in-chief, testified he could not see who defendant was firing at, but that defendant's right hand was fully extended as he fired. Ortega heard three to five gunshots and saw a couple of flashes, and then watched defendant walk out of the bar after he finished shooting.

As explained by the California Supreme Court, "it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim *at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target* is sufficient to support an inference of intent to kill ...." [Citation.]' [Citations.] '"The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. *Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind*." [Citation.]' [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 741, italics added.)

Based on the entirety of the prosecution's evidence in the case-in-chief, the trial court would have denied a defense motion for acquittal on the attempted murder charge given the evidence of express malice and intent to kill. Defense counsel was not prejudicially ineffective for failing to bring such a motion, and defendant's convictions for both attempted murder and second degree murder are not subject to reversal.

Foster, 2019 Cal. App. Unpub. LEXIS 92, at *37-48.

    *a.*    *Legal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-

24

case determinations.")

b.     *Analysis*

Petitioner argues that his trial counsel should have moved for acquittal on count II (attempted murder) after the prosecution's case-in-chief. Petitioner argued in state court that the prosecution had not produced sufficient evidence of express malice and intent to kill as to that count. However, based on the record, the choices made by counsel appear reasonable. As the state court discussed, the evidence introduced during the prosecution's case-in-chief supported the attempted murder charge. Specifically, the state court discussed the evidence of motive, such as Petitioner making a challenging and confrontational statement immediately before the first shot was fired; after the first bullet struck Herman's wife, Petitioner kept shooting; and there was additional evidence to support the inference that Petitioner fired directly at Herman, including that Herman's back was the only target that was still in front of Petitioner in the relatively confined area of the bar, and Petitioner shot Herman twice in the middle of his body mass. Foster, 2019 Cal. App. Unpub. LEXIS 92, at *45-48.

Moreover, Petitioner failed to establish that he suffered prejudice. As the Fifth DCA concluded, based on the entirety of the prosecution's evidence in the case-in-chief, the trial court would have denied a defense motion for acquittal on the attempted murder charge given the evidence of express malice and intent to kill. Id. at *48. Petitioner failed to show that counsel erred or that the error resulted in any prejudice. The claim should be rejected.

2.     Failure to Instruct

Petitioner contends that the trial court should have given the jury an amplified instruction on transferred intent, arguing that the jury was not correctly instructed that transferred intent could apply to his claim of self-defense. In the last reasoned decision, the Fifth DCA denied the claims as follows:

> As set forth above, the prosecution relied on three possible theories in closing argument for count 1, the second degree murder of Janee: express malice, implied malice, and transferred intent. Defendant relied on a self-defense claim based on his trial testimony and his post-arrest statements — that he fired his gun because he saw Herman with a gun and he thought Herman was going to shoot him, possibly as part of an alleged plot against him.

> The court instructed the jury about transferred intent pursuant to CALCRIM No. 562:

> "If the Defendant intended to kill one person, but by mistake or accident killed someone

25

else instead, then the crime, if any, is the same as if the intended person had been killed."

Defendant contends the transferred intent instruction was incomplete and the court had a sua sponte duty to amplify the instruction consistent with his defense — that "self-defense principles apply to the doctrine of transferred intent, that is, if one acts justifiably in self-defense and accidentally harms another, his actions are justified." Defendant asserts such an instruction would have advised the jury that Janee's death was "justifiable" if he acted in self-defense, because "if a person accidentally kills an innocent bystander while justifiably using lethal force in self-defense against an aggressor, the killing is excusable and not a crime."

Defendant concedes he did not request such an instruction but asserts the court's failure to sua sponte instruct on transferred self-defense violated his due process rights to present a defense because he would have been acquitted if the jury had been properly instructed.

"Even absent a request, the trial court must instruct on the general principles of law applicable to the case. [Citation.] The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case. [Citation.] The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citation.] Evidence is 'substantial' only if a reasonable jury could find it persuasive. [Citation.] The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1200, 24 Cal. Rptr. 3d 112, 105 P.3d 487.)

"'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016, 68 Cal. Rptr. 2d 648, 945 P.2d 1197.) "'"The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."' [Citation.]" (*Ibid.*) The omission of an instruction on a defense is not prejudicial if "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.'" (*People v. Wright* (2006) 40 Cal.4th 81, 98, 51 Cal. Rptr. 3d 80, 146 P.3d 531; *People v. Flood* (1998) 18 Cal.4th 470, 484, 76 Cal. Rptr. 2d 180, 957 P.2d 869.) "'[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028, 77 Cal. Rptr. 3d 163, 183 P.3d 1146.)

In order to address defendant's instructional claim, we will briefly review justifiable homicide, perfect and imperfect self-defense, and transferred intent, which show that the jury was properly instructed on all aspects of defendant's claims of reasonable and unreasonable self-defense.

### A. Justifiable or Excusable Homicide

"Homicide, the killing of one human being by another, is not always criminal. In certain circumstances, a killing may be excusable or justifiable. [Citations.]" (*People v. Elmore, supra*, 59 Cal.4th at p. 132, fn. omitted.)

"[E]xcuse is best exemplified by accident or misfortune [citation], and justification is exemplified by the concept of self-defense [citations], although these are not the exclusive bases for excuse or justification. In the absence of factors of excuse or justification, the use of fatal physical force or violence against another person is unlawful." (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1155, 10 Cal. Rptr. 2d 217, fn. omitted.)

**B. Reasonable and Unreasonable Self-defense**

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.] We have also described this mental state as an 'unreasonable but good faith belief' in the need for self-defense. [Citation.] However, it is most accurately characterized as an *actual* but unreasonable belief." (*People v. Elmore, supra*, 59 Cal.4th at pp. 133-134, original italics, fn. omitted.)

**C. Murder and Transferred Intent**

"Transferred intent was one of the common law doctrines that 'survived the enactment of California's murder statute.' [Citations.] 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had "'the fatal blow reached the person for whom intended.'" [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' [Citation.]" (*People v. Bland* (2002) 28 Cal.4th 313, 320-321, 121 Cal. Rptr. 2d 546, 48 P.3d 1107; *People v. Scott* (1996) 14 Cal.4th 544, 548-549, 59 Cal. Rptr. 2d 178, 927 P.2d 288.)

"A person who acts intending to kill victim A but who accidentally kills victim B instead may be guilty of B's murder under the doctrine of transferred intent. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653, 142 Cal. Rptr. 3d 893, 278 P.3d 1242, italics omitted.)

As noted above, the doctrine of transferred intent does not apply to attempted murder, which requires express malice and the intent to kill as to each victim. (*People v. Bland, supra*, 28 Cal.4th at pp. 328, 331.)

**D**. Mathews *and Transferred Self-defense*

While transferred intent is usually applied to extend a perpetrator's culpability for murder, the doctrine has also been extended to claims of self-defense.

"[T]he reasoning [of transferred intent] applies equally to carry the *lack* of criminal intent to the unintended consequences and thus *preclude* criminal responsibility." (*People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023, 154 Cal. Rptr. 628 (*Mathews*), first italics in original, second italics added.) Accordingly, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, *justifiably in self-defense*, inadvertently results in the injury of an innocent bystander." (*Id.* at p. 1024, italics added.)

The doctrine of "transferred self-defense" was first explained in *Mathews*, where the defendant shot into a car and attempted to kill the passenger. The passenger moved out of the way and the driver was killed. The defendant later claimed she was shooting at the passenger in self-defense because the passenger was pointing a gun at her. On appeal, the defendant claimed the trial court had a sua sponte duty to instruct that the homicide was justified under self-defense "where the act of self-defense, though directed towards the unlawful aggressor, inadvertently results in the death of an innocent bystander," so that she would have been acquitted of the murder. (*Mathews, supra*, 91 Cal.App.3d at p. 1023.)

*Mathews* acknowledged that the "principal application" of the doctrine of transferred intent established that "one's criminal intent follows the corresponding criminal act to its unintended consequences." (*Mathews, supra,* 91 Cal.App.3d at p. 1023.) *Mathews* reviewed the common law doctrine and numerous cases and concluded that "the reasoning applies equally to carry the *lack of criminal intent* to the unintended consequences and thus preclude criminal responsibility." (*Ibid.*, original italics.) "[T]he doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." (*Id.* at p. 1024; see also *People v. Levitt* (1984) 156 Cal.App.3d 500, 507-508, 203 Cal. Rptr. 276 (disapproved on other grounds by *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6, 197 Cal. Rptr. 3d 461, 364 P.3d 359); *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357, 37 Cal. Rptr. 2d 304.)

While *Mathews* held the defense is available in California, it also found the trial court did not have a sua sponte duty to so instruct based on the facts of the case. (*Mathews, supra*, 91 Cal.App.3d at pp. 1024-1025.) "[N]either party contested the issue of whether defendant's perceived fear for her life was available to insulate her from liability for the death of [the victim], an innocent third party. Each party assumed that it was. Moreover, the court gave a full complement of standard instructions dealing with self-defense, sufficient for the jury to resolve the issue of defendant's reasonable apprehension of loss of life or great bodily injury and her reaction thereto." (*Id.* at p. 1025.) While the self-defense instructions stated that "to qualify as a justifiable homicide, the 'person killed' must have been the unlawful aggressor" (*ibid.*), *Mathews* held the instruction did not preclude the jury from finding the defendant acted in self-defense because it "merely advise[d] that homicide is justified when the unlawful aggressor is the person killed. It does *not* state that homicide is *unjustified* where the unlawful aggression of one results

in the inadvertent death of another. Moreover, that court did instruct [citation] that '[if] the right of self-defense exists, it is a complete defense to any crime committed during the exercise of the right.'" (*Ibid.*, original italics.)

## E. Analysis

Defendant argues the court had sua sponte duty to instruct on his defense of transferred self-defense based on his testimony that he fired at Herman in self-defense, and that he did not intend to shoot Janee. Defendant contends the jury could have concluded that in trying to defend himself against Herman, he inadvertently shot Janee. Defendant asserts that if the jury found his claims of either reasonable or unreasonable self-defense were credible, an instruction on transferred self-defense would have resulted in his acquittal for the murder of Janee, or conviction of voluntary manslaughter as a lesser included offense.

The transferred intent instruction that was given in this case must be considered in light of the instructions that preceded it. As set forth above, the jury was fully and accurately instructed on murder, express and implied malice, manslaughter, justifiable homicide, and reasonable and unreasonable self-defense. "If a person kills with a legally valid excuse or justification, the killing is lawful, and he or she has not committed a crime." CALCRIM No. 505, justifiable homicide and self-defense, stated: "The Defendant is not guilty of murder or manslaughter or attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense." CALCRIM No. 520 defined the elements of murder and stated the jury had to find defendant killed "without lawful justification." The court then gave CALCRIM No. 562 on transferred intent:

"If the Defendant intended to kill one person, but by mistake or accident killed someone else instead, *then the crime, if any, is the same as if the intended person had been killed*." (Italics added.)

The transferred intent instruction was immediately followed by CALCRIM No. 562, defining voluntary manslaughter based on imperfect self-defense: "*If you conclude the Defendant acted in complete self-defense, his action was lawful, and you must find him not guilty of any crime*." (Italics added.)

The entirety of the instructions did not preclude the jury from finding that defendant acted in self-defense when he fired at Herman, and Janee could have been an innocent bystander so that her death was justifiable. The jury was repeatedly instructed that the homicide of Janee was justifiable if defendant acted in complete self-defense. The transferred intent instruction further stated that if he intended to kill one person but by mistake killed another person, "*then the crime, if any, is the same as if the intended person had been killed*." (Italics added.) Such language instructed the jury that if it found defendant intended to kill Herman in complete self-defense, but he mistakenly shot and killed Janee, then the crime "if any" was the same as if the intended person (Herman) had been killed — a justifiable homicide.

29

Both the prosecutor and defense counsel addressed defendant's claim of self-defense, and that it was based on his belief that Herman was going to shoot him. The prosecutor attacked defendant's credibility in light of his flight to Cleveland, and the conflicting statements between his postarrest interview and trial testimony, but did not challenge defendant's assertion that a credible claim of complete self-defense could result in acquittal.

We thus conclude that to the extent the court was required to instruct on transferred self-defense, the entirety of the instructions permitted the jury to acquit defendant of the murder of Janee if it found his self-defense claim credible. The jury's verdicts indicate to the contrary.

Foster, 2019 Cal. App. Unpub. LEXIS 92, at *48-59.

    *a.    Legal Standard and Analysis*

It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings).

The state court determined that the trial court did not improperly instruct on transferred self-defense. Rather, it found that the entirety of the instructions permitted the jury to acquit Petitioner of the murder of Janee if it found his self-defense claim credible. Foster, 2019 Cal. App. Unpub. LEXIS 92, at *59. Since the state court determined that the challenged instruction was a correct statement of the law, Petitioner's challenge does not give rise to a federal question cognizable on federal habeas review. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Thus, the claim is not cognizable on federal habeas and should be rejected.

Even if the Court finds the claim cognizable, it is without merit. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even

30

"universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146-47 (1998).

Petitioner's claim does not merit relief. As Respondent contends, the state court analyzed the entirety of the jury instructions consistent with Supreme Court precedent. (Doc. 11 at 35.) The instruction adequately conveyed California law on transferred self-defense. The state court reasonably found that the entirety of the instructions did not preclude the jury from finding that Petitioner acted in self-defense when he fired at Herman, and Janee could have been an innocent bystander so that her death was justifiable. As the state court emphasized, the jury was repeatedly instructed that the homicide of Janee was justifiable if Petitioner acted in complete self-defense. Foster, 2019 Cal. App. Unpub. LEXIS 92, at *58. The state court additionally noted that both the prosecutor and defense counsel addressed Petitioner's claim of self-defense. Id. Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of Supreme Court authority. The claim should be denied.

3.    Instructional Error

Petitioner claims that the trial court erred in giving a supplemental instruction on imperfect

self-defense. In the last reasoned decision, the Fifth DCA denied the claims as follows:

> The court instructed the jury with the pattern version of CALCRIM No. 571, which correctly defined voluntary manslaughter based on imperfect self-defense. In doing so, the court included the following optional paragraph in the instruction:

> "Imperfect self-defense does not apply when the Defendant *through his own wrongful conduct* has created circumstances that justify his adversary's use of force." (Italics added.)

> Defendant challenges this paragraph and asserts it was not supported by the evidence, since the jury could have wrongly concluded that defendant's "wrongful conduct" was merely the exchange of words with Herman immediately before the shooting. Defendant argues the court's inclusion of this paragraph was prejudicial because it prevented the jury from properly evaluating his claim of self-defense.

> ### A. Failure to Object

> We first note that defendant did not object to CALCRIM No. 571 in general or to this particular paragraph, and he has not raised a claim of ineffective assistance. Nevertheless, we review the merits of his claim of error to determine whether the instruction affected his substantial rights. (§ 1259.) "'[A] defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's "substantial rights." [Citation.] In this regard, "[t]he cases equate 'substantial rights' with reversible error" under the test stated in *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243 .... [Citation]' [Citations.] 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim ....' [Citation.]" (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 553, fn. 11, 99 Cal. Rptr. 3d 324; *People v. Jimenez* (2016) 246 Cal.App.4th 726, 730, 201 Cal. Rptr. 3d 76.)

> ### B. The Perpetrator's "Wrongful Conduct"

> The "optional" paragraph in CALCRIM No. 571 that was given in this case is based on *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574:

> "It is well established that the ordinary self-defense doctrine — applicable when a defendant *reasonably* believes that his safety is endangered — may not be invoked by a defendant who, through his own wrongful conduct (e.g., *the initiation of a physical assault* or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, ... the imperfect self-defense doctrine cannot be invoked in such circumstances." (*Ibid.*, italics added.)

> The California Supreme Court has repeatedly approved this principle. (*People v. Seaton* (2001) 26 Cal.4th 598, 664, 110 Cal. Rptr. 2d 441, 28 P.3d 175; *People v. Hardin* (2000) 85 Cal.App.4th 625, 630, 102 Cal. Rptr. 2d 262; *People v. Enraca* (2012) 53 Cal.4th 735, 761-762, 137 Cal. Rptr. 3d 117, 269 P.3d 543.)

### C. Analysis

Defendant contends the court's inclusion of this paragraph in CALCRIM No. 571 prevented the jury from considering his self-defense claim, and it was prejudicial because there was no evidence he committed an assault or any felony before the shooting started. Defendant asserts the jury could have decided that he could not raise self-defense simply because he exchange words with Herman, even though their conversation would not have been sufficient to trigger the advisement in CALCRIM No. 571.

Herman testified that when defendant tried to pick up Janee, Janee replied that she was married, and Herman told defendant in a "joking" way that Janee was his wife. Defendant asked Herman if he knew who he was and declared that Herman did not know who he was talking to, using challenging and confrontational language. Herman tried to shake hands with him, but defendant declined and walked away. Immediately before the shots were fired, defendant again used challenging and confrontation language to Herman, who testified that he turned around and saw defendant holding the gun.

In contrast, defendant told the police and testified at trial that Herman was the first person to pull his weapon, and that defendant felt compelled to draw his nine-millimeter handgun because he was afraid Herman was going to shoot him. Herman admitted at trial that he pulled his .45-caliber Glock handgun, but that he did so only after defendant had shot Janee and himself and that he never fired any rounds. Herman also admitted he passed his gun to his neighbor before the police arrived at the bar.

While CALCRIM No. 571 did not define "wrongful conduct," the California Supreme Court has held that such actions include "the initiation of a physical assault or the commission of a felony." (*In re Christian S., supra*, 7 Cal.4th at p. 773, fn. 1.) The entirety of the evidence, particularly the prosecution's rebuttal witnesses, supported the inference that defendant was provoking Herman to elevate their exchange from a verbal dispute to a physical assault. Adelesmo Cazares, the bar manager, testified that two men were talking but it "escalate[d] a little higher," and then he saw the first muzzle flash. Phillip Colmenero, who was helping the bartender, told the police that Herman held out his hands and tried to calm down defendant during the verbal exchange. Colmenero said that as Herman tried to calm him down, defendant said, "F[**]k that,'" and "'Why you tripping for? What — don't — don't be tripping like that.'" Colmenero said defendant also said, "'What, mother f[**]ker? Who is tripping now.'" While the witnesses testified that only one man fired gunshots, the evidence could have raised the inference that defendant was about to provoke Herman into a physical dispute and Herman may have reached for his weapon. Under such circumstances, the optional paragraph of CALCRIM No. 571 was supported by the evidence and would have prevented defendant from claiming perfect or imperfect self-defense.

In any event, the jury's verdicts indicate that it rejected defendant's self-defense claim and his credibility, particularly his insistence that he never shot Janee. The court's decision to include the paragraph in CALCRIM No. 571 was not prejudicial.

<u>Foster</u>, 2019 Cal. App. Unpub. LEXIS 92, at *59-63.

      *a.      Legal Standard and Analysis*

      As stated above, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Gilmore v. Taylor</u>, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").

      The state court determined that the trial court's supplemental instruction on imperfect self-defense was not improper. <u>Foster</u>, 2019 Cal. App. Unpub. LEXIS 92, at *61-63. Since the state court determined that the challenged instruction was not improper, Petitioner's challenge does not give rise to a federal question cognizable on federal habeas review. <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Thus, the claim is not cognizable on federal habeas and should be rejected.

      Even if the Court finds the claim cognizable, it is without merit. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." <u>Id</u>. (citation omitted); <u>see</u> <u>Calderon v. Coleman</u>, 525 U.S. 141, 146-47 (1998). Petitioner takes issue with the inclusion of the supplemental paragraph in CALCRIM No. 571, however, the optional paragraph was supported by the evidence. As the state court discussed, the entirety of the evidence supported the inference that Petitioner was provoking Herman to elevate their exchange from a verbal dispute to a physical assault. <u>Foster</u>, 2019 Cal. App. Unpub. LEXIS 92, at *62. Moreover, the jury's verdicts indicate that it rejected Petitioner's self-defense claim and his credibility, particularly his insistence that he never shot Janee. <u>Id</u>. at *63. The state court reasonably concluded that the trial court's decision to include the paragraph in CALCRIM

No. 571 was not prejudicial. Accordingly, Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). Therefore, the claim should be denied.

## IV.     RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   __**November 7, 2019**__                    _____**/s/ Jennifer L. Thurston**
                                                                                  UNITED STATES MAGISTRATE JUDGE